Filed 3/24/21

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B303013 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA095974) |
| v. | |
| MARCO MOINE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George F. Bird, Judge.  Reversed and remanded with directions.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B and C of the Discussion.

Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Marco Moine of two counts of making criminal threats in violation of Penal Code section 422, subdivision (a).[1]  The trial court suspended imposition of sentence and placed Moine on probation for five years.

Prior to trial, Moine sought mental health diversion under sections 1001.35 and 1001.36, citing his diagnoses of Bipolar I disorder and attention-deficit/hyperactivity disorder (ADHD). The trial court denied the request for diversion, finding Moine posed an unreasonable risk of danger to public safety.  During the subsequent jury trial, the court excluded testimony by Moine's court-appointed psychiatrist concerning Moine's mental health disorder.

On appeal, Moine argues his conviction must be reversed, claiming the denial of mental health diversion and the wholesale exclusion of the psychiatrist's testimony was erroneous and prejudicial.  Moine also argues the trial court erred in joining two unrelated charges, and the length of his probation must be reduced given the recent amendments to section 1203.1.

In the published portion of this opinion, we hold that the trial court abused its discretion in finding that Moine posed an unreasonable risk of danger to public safety.  We reverse and remand the matter with instructions for the trial court to conduct a new hearing to consider Moine's eligibility for mental health

————————————

[1] Subsequent statutory references are to the Penal Code, unless otherwise specified.

diversion. In the event he is again found ineligible for diversion, the trial court may conduct a new trial on the criminal threats charges.

In the unpublished portion of the opinion, we conclude the trial court erred in excluding the psychiatrist's testimony, and the error was prejudicial, warranting reversal of Moine's conviction for making criminal threats. We do not reach Moine's other arguments.

## FACTUAL AND PROCEDURAL SUMMARY

The People charged Moine with three counts of assault (the assault counts) and two counts of making criminal threats (the criminal threat counts) for two separate incidents occurring in the offices of two different medical care providers.

The first incident involved a fist-fight that took place in the waiting room of an urgent care facility in Palos Verdes on April 20, 2017. On that day, while Moine was in the waiting room, he asked a staff member at the front desk to turn off the television. Another patient confronted Moine about his request, and they entered into a fist fight. They each landed blows upon the other. At trial, they each presented conflicting testimony about who initiated the confrontation and who was more aggressive.

The second incident took place nearly a year later in another medical provider's waiting room. On March 12, 2018, Moine sought medical care at an urgent care clinic in Loma Linda, hoping to secure a refill of his medications. After Moine saw the physician's assistant, an office manager escorted Moine from the treatment room and handed him his prescription. Moine became upset that a referral to a psychiatrist had not been

3

approved, and he questioned the office manager about the medication he had been prescribed.

As Moine left the medical office with his mother, the office manager heard him say something "along the lines of, 'This is America. I can go home and get my gun and come back and shoot all of you.'" The officer manager explained that over the course of a five-minute period, Moine made several other statements, which she described as "ranting," and he was cursing, pacing, and "talking with his hands up in the air" as he spoke.

A nurse who was at the front desk testified that Moine was visibly upset. She did not "remember exactly" the words Moine spoke, but recalled him saying "If I didn't get—they are lucky—they are lucky I don't have my gun with me, otherwise I would kill everybody here." He continued, "I am going to come in and kill everybody here." On cross examination, she agreed he also used the phrase, "If I had a gun."[2]

Moine testified that he became upset because the office manager handed him a prescription for a medication he had not been prescribed before. He was concerned because he "didn't understand [the medication]'s side effects." When he asked the office manager about the prescription, "she dismissed [his] concerns entirely," retorting, "Oh, so you went to medical school." Moine was "shocked" by this behavior, and responded, "If the Parkland guy came in here, would you have been condescending to him, too?"[3] He continued by noting there were 30,000 gun

---

[2] There is no evidence in the record that Moine owned, possessed, or had access to any guns or firearms.

[3] As explained by the prosecutor in closing argument, the Parkland shooting was a mass shooting incident in which 17 young people were killed.

4

deaths in America every year and that "she was blowing caution to the wind by mocking someone who had just told her he struggles with mental health issues."[4]  He cautioned her "against being rude to strangers" because it was possible people could "respond violently."  He then realized that he "had made a major error in trying to explain [him]self and [he] immediately apologized."

Moine's mother was present at the medical clinic that day, and she testified that she heard Moine say, "If I were the sort of person who had a gun, I would come back and shoot you."  But she emphasized that Moine "immediately" apologized, and did so "profusely."

After he left with his mother, Moine returned to the office about 20 minutes later to search for his identification card, which he had misplaced.  Moine was arrested three weeks later and told law enforcement officers that he did not threaten anyone.

The People charged Moine for both incidents in an amended information, charging him with two felony counts for assault and battery and one misdemeanor count for battery for the first incident (§ 245, subd. (a)(4), count 1; §§ 242, 243, subd. (d), count 2; and § 242, count 3), and two felony counts of making criminal threats for the second incident (§ 422, subd. (a), counts 4 & 5).

The jury found Moine not guilty of the assault charges involving the first incident.  They found him guilty of making

---

[4] As we explain below, the trial court sustained the prosecution's objection and excluded expert testimony concerning Moine's mental health disorder.  As a result, Moine's references to his mental health in his statements to the office manager were the only evidence the jury received about his disorder.

criminal threats at the second facility, as charged in counts 4 and 5.

At the sentencing hearing on November 19, 2019, the trial court suspended imposition of sentence and placed Moine on probation for five years.

Moine timely appealed.

## DISCUSSION

### A.    Mental Health Diversion

#### 1.    *Factual Background*

Moine filed a pre-trial motion seeking mental health diversion under section 1001.36.  His motion attached a medical report by a court-appointed psychiatrist, Joel P. Leifer, MSW, Ph.D.

Dr. Leifer diagnosed Moine as suffering from Bipolar I and ADHD, which are recognized mental disorders.  (See <u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) Bipolar and Related Disorders</u>; *id.* at <u>Disruptive, Impulse-Control, and Conduct Disorders.</u>)  In reference to Moine's report about the second incident involving the criminal threats charges, Dr. Leifer noted that "[a]t the time of this offense, . . . Moine had been experiencing an exacerbation of his manic symptoms and was desperate for mitigation of these symptoms."

Dr. Leifer opined that both of the alleged "crimes have occurred in the course of the emergence of [Moine's] severe manic symptoms, and/or in his attempt to manage them."  The report concluded Moine "has never been adequately diagnosed, treated, or psychiatrically stabilized on any effective medication regimen." Referencing a forensic assessment dated February 17, 2019, by another psychiatrist, Dr. Knapke, under Evidence Code section

6

730, Dr. Leifer noted that "[b]oth Dr. Knapke and I concur that [Moine] is at low risk for future assault."

The People filed written opposition to mental health diversion, arguing that Moine would pose an unreasonable risk of danger to public safety if he were treated in the community. The opposition did not include an analysis of the term "unreasonable risk of danger to public safety," as defined in section 1001.36, subdivision (b)(1)(F).

The trial court announced its ruling at a brief hearing on October 9, 2019, noting that it had read the papers and considered argument by counsel. The court denied the request for diversion. In reaching its decision, the court stated it assumed the facts alleged with respect to the two underlying incidents to be true. Based on the fact that Moine was present at two mental health facilities and "engaged in acts of violence" against others who were present, his conduct demonstrated that he posed "a danger to the public and releasing him into a pretrial status where he would be working on diversion is contrary to public safety." (See § 1001.36, subd. (b)(1)(F).)

We note that immediately following this ruling, the court confirmed that Moine remained out of custody and on bail, a status he had enjoyed since at least the time of the preliminary hearing on the assault charges on June 9, 2017.

2. *Legal Framework*

Effective June 27, 2018, the Legislature created a diversion program for defendants with diagnosed mental disorders. (See § 1001.36, subd. (a).)[5] The purpose of the statute is twofold: (1) to

---

[5] Section 1001.36 was amended effective January 1, 2019, to specify that defendants charged with certain crimes, such as

7

increase "diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system"; and (2) to provide "diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a) and (c).)

" '[P]retrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (c).)

A trial court may grant pretrial diversion under section 1001.36 if the court finds: (1) the defendant suffers from a qualifying mental disorder; (2) the mental disorder was a "significant factor" in the commission of the charged offense; (3) a qualified mental health expert opines the defendant's symptoms will respond to treatment; (4) the defendant consents to diversion and waives his or her speedy trial rights; (5) the defendant agrees to comply with the treatment as a condition of diversion; and (6) "the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (b)(1)(A)-(F).)

If the trial court grants pretrial diversion and the defendant performs "satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's

---

murder and rape, are "categorically ineligible for diversion." (*People v. Frahs* (2020) 9 Cal.5th 618, 640, citing § 1001.36, subd. (b)(2), added by Stats. 2018, ch. 1005, § 1.) The statute also was the subject of technical, nonsubstantive amendments that became effective January 1, 2020. (Stats. 2019, ch. 497, § 203.) Those amendments are not at issue in the present case.

criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (§ 1001.36, subd. (e).) If the defendant does not perform satisfactorily in diversion, becomes gravely disabled, or commits new crimes, the court may reinstate criminal proceedings. (§ 1001.36, subd. (d).)

3. *Standard of Review*

The standard of review on appeal from a trial court's denial of mental health diversion is not settled. We conclude an abuse of discretion standard applies for the following reasons.

First, in delineating the trial court's authority by use of the word "may," the statutory language itself indicates the trial court has broad discretion to grant or deny diversion. (See § 1001.36, subd. (a) ["the court may" grant pretrial diversion], subd. (b)(1) ["[p]retrial diversion may be granted" if certain criteria are met]; *People v. Lockwood* (1998) 66 Cal.App.4th 222, 227 [because "the word 'may' connotes a permissive standard," an appellate court reviews a claim of error under a statute using the term "may" for abuse of discretion].) Second, the statute requires the court to consider and balance six factors, as set forth above, and provides that the court also "may consider . . . any other factors that the court deems appropriate." (§ 1001.36, subd. (b)(1)(F).) Third, the statute signals deference to the trial court's review of three of the six criteria by authorizing diversion if "[t]he court is satisfied" the defendant suffers from a qualifying mental disorder, the disorder was a significant factor in the commission of the crime, and the defendant will not pose an unreasonable risk of danger to public safety. (§ 1001.36, subd. (b)(1)(A), (B), & (F).)

Finally, by requiring the trial court to evaluate the "risk" posed to public safety, the statutory language directs the court to perform a quintessential discretionary function. (See *People v.*

9

*Frahs*, *supra*, 9 Cal.5th at p. 639 [noting that "the Legislature left it to trial courts to make fact-specific evaluations of risk under [§] 1001.36, [subd.] (b)(1)(F)].) Analyzing similar language requiring consideration of "dangerousness" in section 1170.18, subdivision (b), Courts of Appeal have applied the abuse of discretion standard.[6] (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242; *People v. Hall* (2016) 247 Cal.App.4th 1255, 1264.) Because section 1001.36's dangerousness prong references section 1170.18, and requires that the court be "satisfied" the defendant will not pose an unreasonable risk of danger, we conclude that same standard applies to review of a dangerousness finding under section 1001.36.

A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard (*People v. Knoller* (2007) 41 Cal.4th 139, 156; *People v. Hall, supra*, 247 Cal.App.4th at p. 1264), or bases its decision on express or implied factual findings that are not supported by substantial evidence (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1055).

4.     *The Trial Court Abused its Discretion in Finding Diversion Would Pose an Unreasonable Risk of Danger to Public Safety*

As an initial matter, we observe that one of Moine's mental disorders, bipolar disorder, is a mental disorder that facially qualifies for mental health diversion. Section 1001.36,

---

[6] Pursuant to Proposition 47, section 1170.18 authorizes persons convicted of certain felonies to petition for resentencing, unless the court "determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b).)

subdivision (b)(1)(A) defines a qualifying mental disorder as one that is "identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia."

The trial court denied diversion solely on the ground that Moine was too dangerous to be treated in the community. Thus, the focus of our inquiry is on this sixth factor. Section 1001.36's definition of "unreasonable risk of danger to public safety" is supplied by reference to section 1170.18. (§ 1001.36, subd. (b)(1)(F) [the trial court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in [§] 1170.18"].) Section 1170.18, in turn, defines "unreasonable risk of danger to public safety" as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).) The violent felonies encompassed in this definition "are known as 'super strikes' and include murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by death or life imprisonment." (*People v. Jefferson*, *supra*, 1 Cal.App.5th at p. 242.) They also include sexually violent offenses and sexual offenses committed against minors under the age of 14. (See § 667, subd. (e)(2)(C)(iv).)

Section 1001.36's reliance on the definition of dangerousness in section 1170.18, necessarily encompasses the

list of super strike offenses found at section 667, subdivision (e)(2)(C)(iv).  By requiring an assessment of whether the defendant "will commit a new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(iv), a trial court necessarily must find the defendant is "likely to commit a super-strike offense."  (*People v. Hoffman* (2015) 241 Cal.App.4th 1304, 1310 [reviewing a dangerousness finding under § 1170.18].)  Thus, the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies.  (See *ibid.*)

In determining the risk of danger, section 1001.36 contemplates the trial court will consider the opinions of the district attorney, the defense, and qualified mental health experts, as well as the defendant's violence and criminal history, the current charged offenses, and any other factors the court deems appropriate.  (§ 1001.36, subd. (b)(1)(F).)

As discussed above, Dr. Leifer and Dr. Knapke found that Moine posed "a low risk for future assault."  In addition to the two pending matters involving felony charges of assault and making criminal threats, Moine also had a pending misdemeanor charge of resisting an officer in violation of section 148, resulting from his refusal to comply with officers' commands in responding to a report of a possible overdose.  He also faced a misdemeanor charge of petty theft in violation of sections 484 and 490.2, for stealing medical supplies.

There is no indication whether the trial court was provided a record of Moine's prior criminal history in reaching its decision to deny diversion.  Nonetheless, we note that the probation officer's report indicates Moine had four prior misdemeanor

12

convictions, three for drug or alcohol related offenses and one for hit and run.[7]

None of Moine's past convictions involved a violent felony, let alone a super-strike felony. (See § 667, subd. (e)(2)(C)(iv).) The pending charges, while involving allegations of violence and threats of violence, are not super-strike offenses. There is nothing in the record to indicate the prosecution presented evidence to suggest Moine was likely to commit such an offense in the future, and the circumstances of the pending charges did not support such an inference. To the contrary, two psychiatrists determined that he posed a low risk for future assault.

In contrast to the present case, Courts of Appeal have affirmed denials of resentencing under section 1170.18's "dangerousness" prong where the petitioners had long criminal histories involving violent felonies. In *People v. Hall*, *supra*, 247 Cal.App.4th at pp. 1265-1266, the defendant had a history of felony convictions that spanned "nearly two decades," including two prior strike convictions for robbery. In addition, he had served time in prison for three different convictions, and he had pressed a knife to the victim's stomach in committing the most recent offense. (*Ibid*.) On the basis of the length and severity of his criminal history, the Court of Appeal held the trial court properly found that it was reasonable to infer the defendant posed a risk of "using deadly force." (*Id*. at p. 1266; see also

---

[7] The convictions were as follows: (1) 2009 driving under the influence of alcohol or drugs (Veh. Code, § 23152, subd. (a)); (2) 2014 hit and run (Veh. Code, § 20002); (3) 2016 possession of drug paraphernalia (Health & Saf. Code, § 11364.1, subd. (a)); and (4) 2016 possession of a controlled substance without a prescription (Health & Saf. Code, § 11375, subd. (b)(2)).

13

*People v. Jefferson*, *supra*, 1 Cal.App.5th at p. 243 [affirming denial of resentencing under § 1170.18 where the petitioner had a history of violent felonies, including armed robbery, burglary, and assault with a firearm].)  These are clearly not the facts before us.

Given the high standard applicable to a finding of "dangerousness" under sections 1001.36 and 1170.18, the opinion by two psychiatrists that Moine posed a low risk of committing assault, his misdemeanor criminal history, and the circumstances of the pending charges, the record does not support the trial court's implied finding that Moine was likely to commit a super-strike offense if he received mental health treatment in the community.  (See, e.g., *People v. Hoffman*, *supra*, 241 Cal.App.4th at p. 1310 [concluding that the record did not support a finding of dangerousness under § 1170.18 where the petitioner's seven felony convictions for grand theft were not super-strike offenses, and she had no prior criminal history].)

Our conclusion is further supported by the trial court's decision to release Moine into the community on bond for a period of over two years, which indicates the court necessarily found that Moine was not likely to cause "great bodily harm to others" if released.  (Cal. Const., art. I. § 12, subds. (b) & (c).)  It is logically inconsistent to deny mental health diversion on the ground that Moine was likely to commit a super-strike offense, while simultaneously finding he was not likely to inflict great bodily injury on persons in the community.

Insofar as the respondent contends that Moine cannot be safely treated in a mental health facility because his current offenses were committed in similar facilities, the argument is not pertinent to the question of whether Moine posed an

unreasonable risk of danger as defined in section 1170.18.  It may be a consideration that is ripe for exploration on remand.  (See § 1001.36, subd. (c) [the court must be "satisfied" the recommended treatment program "will meet the specialized mental health treatment needs of the defendant"].)

We emphasize that our decision is limited to consideration of the risk of danger, which is only one of the criteria set forth in section 1001.36.  We express no opinion on whether Moine will be able to demonstrate eligibility for mental health diversion under the remainder of the criteria set forth in section 1001.36.  Consistent with the remedy afforded by our Supreme Court in *Frahs*, we conclude that a remand is warranted, at which the trial court shall conduct a new hearing to consider Moine's eligibility for diversion.  (*People v. Frahs*, *supra*, 9 Cal.5th at p. 640 [fashioning a remedy in the form of a conditional remand for further consideration of the defendant's eligibility for mental health diversion under § 1001.36].)

## B.    **Right to Present a Defense**

Following the denial of mental health diversion, the case was transferred to a different department for trial.  Moine contends the trial court abused its discretion and violated his federal constitutional right to present a defense by excluding testimony by Dr. Leifer.  (See *Washington v. Texas* (1967) 388 U.S. 14, 19 [87 S.Ct. 1920, 18 L.Ed.2d 1019]; *People v. Marshall* (1996) 13 Cal.4th 799, 836 ["a criminal defendant is constitutionally entitled to present all relevant evidence of significant probative value in his favor"].)  We agree.

### 1.    *Factual Background*

We describe in some detail the various hearings in which the trial court considered the admissibility of Dr. Leifer's

15

testimony, to convey the lengths the trial court went through to gain an understanding of the scope of the proffered testimony. While we highlight the portions of defense counsel's arguments that were supported by the law, we also acknowledge that at times, defense counsel had difficulty articulating his position, and he sometimes made contradictory statements that stymied the discussion.

Prior to trial, the People moved in limine to exclude all testimony by Dr. Leifer, citing sections 28 and 29. During a pretrial hearing, the trial court asked defense counsel to explain how Dr. Leifer's testimony would be relevant to Moine's specific intent to commit the charged crime. Defense counsel explained that Dr. Leifer would testify that Moine suffered from bipolar disorder, ADHD, anxiety, and general depression, which was relevant to whether he had acted with specific intent, and would explain his demeanor and behavior. In the course of further argument, the court cautioned that pursuant to section 29, Dr. Leifer could not testify that Moine lacked the specific intent to commit the charged crime.

During a further pretrial hearing, defense counsel agreed Dr. Leifer could not testify about Moine's specific intent to commit the offense. In support of his position, he offered citations to *People v. Coddington* (2000) 23 Cal.4th 529, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13, and *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*), as well as CALCRIM No. 3428.[8] The trial court reviewed CALCRIM No. 3428 and concluded Dr.

_____

[8] We discuss *Cortes* and CALCRIM No. 3428 in detail below.

Leifer's testimony should be precluded as to the assault charges because they were general intent crimes. Defense counsel countered that the testimony was admissible with respect to the criminal threats charges because they involved a specific intent crime. Not persuaded that Dr. Leifer's proffered testimony would be relevant, the trial court agreed to conduct an Evidence Code section 402 hearing to consider the matter further.

At the start of the Evidence Code section 402 hearing, defense counsel requested that it be conducted in camera outside the presence of the prosecutor, explaining that he did not want to reveal the defense case. The trial court explained this would not be possible, and took the opportunity to inquire again about the relevance of Dr. Leifer's testimony. The court stated that it understood Dr. Leifer would testify about Moine's mental health conditions to explain his actions at the clinic. The court also noted that it did not have the doctor's report, which had been submitted before a different judicial officer in support of Moine's motion for mental health diversion.

Defense counsel responded that Dr. Leifer was necessary to support the defense to the criminal threats charges "[b]ecause then the jury can make up their mind whether my client had the specific intent." He further explained that Dr. Leifer could show that Moine's conditions "affect[ ] his ability to process, to communicate, [and his] nonverbal communication," which would "explain why [t]his crazy person rant was going on and that his words, they were . . . meaningless."

The trial court tentatively ruled it would exclude Dr. Leifer's testimony because all of defense counsel's "responses . . . seem to go back to, he's ultimately—he is testifying to an ultimate issue in the case, that is whether the defendant

17

harbored the specific intent to commit the crimes charged." The trial court continued the Evidence Code section 402 hearing so that it could consider Dr. Leifer's testimony after the prosecutor rested her case-in-chief.

After the People rested, the court again asked defense counsel for his offer of proof regarding Dr. Leifer's testimony. Counsel reiterated that Dr. Leifer would testify about Moine's mental health disorders and that they "affect his ability to think clearly." The trial court pressed counsel to explain how the testimony would negate the element of specific intent required for making criminal threats. Counsel explained that under CALCRIM No. 3428, the jury would be able to consider the psychiatrist's testimony to determine "whether at the time of the charged crime the defendant acted or failed to act with the intent or mental state required for that crime."[9]

The trial court found the offer of proof inadequate, quoting section 28: " 'Evidence of mental impairment may not be considered for general intent crimes.' " The court then asked, "Is count 1 a general intent crime?" Defense counsel replied, "Yes," and the court ruled: "The expert will not be permitted to testify. Let's call out the jurors." The trial court did not address the charges for making criminal threats, and did not provide defense counsel a further opportunity to address those counts. The anticipated Evidence Code section 402 hearing did not proceed.

---

[9] CALCRIM No. 3428 provides, in part: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime."

18

The next day, during a discussion prior to the jury's arrival, the trial court asked defense counsel, "With regard to the defense witness, the doctor, is the doctor available?" Defense counsel replied Dr. Leifer was not present because "[the court] said he is not permitted to testify." The trial court asked defense counsel again why counsel believed Dr. Leifer's testimony was relevant, and counsel explained that once the jury "heard some evidence that the defendant did suffer from some mental defect, then they can consider this, only for the limited purpose" set forth in CALCRIM No. 3428, to negate an element of making criminal threats. The following exchange then took place:

"The Court: I am not trying to minimize your client's mental [health] issues, but let's say your client was left-handed and you wanted the jurors to know if he was left-handed. And you are telling me that the jurors could use the fact that he is left-handed to decide whether he had the specific intent to or not to commit the crime, or if he had a bad day, he woke up with a headache or a sinus infection, and his sinus infection bothered him so much during the day that it just bothered him, and would the jurors be able to use the sinus infection in that proffered jury instruction to—would I allow argument that specific intent was negated because of the defendant's sinus infection?

"[Defense Counsel]: I don't know if there is a jury instructions [*sic*] on physical—a physical thing like that, but I am just focusing . . . .

"The Court: In a bad mood. It was Monday, he woke up late, a lot of stress in his life and he flunked out of AP history, and he was fired from McDonald's and he was just having a really awful day. What is all of that relevant to?"

The trial court concluded: "The doctor will not be permitted to testify. There is no link between the proffered testimony and the issues in this case." By virtue of excluding Dr. Leifer's testimony in its entirety, the trial court ensured that no evidence of Moine's mental health condition was received by the jury (other than Moine's own oblique reference to struggling with "mental health issues," as described above).

2.    *Legal Framework*

The admission of expert testimony in criminal cases is limited by sections 28 and 29. Section 28 prohibits "[e]vidence of mental disease, mental defect, or mental disorder . . . to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." Such evidence "is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (*Ibid*.) Section 29 prohibits "any expert testifying about a defendant's mental illness, mental disorder, or mental defect" from discussing "whether the defendant had or did not have the required mental states . . . for the crimes charged." That question is reserved for the trier of fact. (*Ibid*.)

"Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present." (*People v. Coddington, supra*, 23 Cal.4th at p. 583.) " 'Put differently, sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or

20

psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged.' " (*People v. Herrera* (2016) 247 Cal.App.4th 467, 476 (*Herrera*), quoting *Cortes, supra*, 192 Cal.App.4th at p. 908.)

3.      *Standard of Review*

"In general, we review the trial court's exclusion of evidence for abuse of discretion.  [Citation.]  'But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case.'  [Citations.]  We apply independent review to ' "mixed question determinations affecting constitutional rights." '  [Citation.]  To the extent the trial court bases its evidentiary ruling on a conclusion of law, such as its conclusion here that the Evidence Code prohibits anything related to mental state at the time of the [offense], we review its conclusion de novo." (*Herrera, supra*, 247 Cal.App.4th at p. 475.)

4.      Cortes *and* Herrera

Moine analogizes the claimed error here to the erroneous exclusion of psychiatric expert testimony analyzed by the Courts of Appeal in *Cortes* and *Herrera*.  We review them both to illustrate why they are dispositive of the issues raised here.

The defendant in *Cortes* was charged with first degree murder for stabbing another man to death during an altercation at a party. (*Cortes, supra*, 192 Cal.App.4th at pp. 876-877.)  The defense sought to introduce testimony by a psychiatrist retained to evaluate the defendant's likely mental state at the time of the killing. (*Id*. at p. 891.)  The psychiatrist would have opined the

21

defendant entered a dissociated state at the time of the killing as a result of a traumatic beating he experienced as a teenager. (*Id.* at pp. 892-893.) The trial court precluded the psychiatrist from testifying about "[the] defendant's upbringing, traumatic events in his life or their effect on his mental condition at the time of the crime, *at all*." (*Id.* at p. 899.) The Court of Appeal concluded this was erroneous because "at a minimum, [the psychiatrist] should have been permitted to testify to [the] defendant's diagnoses . . . [, and the] defendant's . . . traumatic experiences as a child and/or adolescent, inasmuch as [the] defendant's prior traumatic experiences informed [the psychiatrist's] opinion, and explained the connection between [the] defendant's diagnoses, his mental state and his behavior." (*Id.* at p. 910).

The Court of Appeal concluded the error was prejudicial because it "effectively eviscerated any defense [the] defendant had to premeditated and deliberated murder," and "prevented the jury from properly evaluating evidence that would have been relevant to its considerations of the self-defense, imperfect self-defense and heat of passion instructions given . . . ." (*Cortes*, *supra*, 192 Cal.App.4th at p. 912.) Compounding the error, the Court of Appeal observed that "[t]he prosecutor took full advantage of the court's ruling in closing argument," arguing "that there was no alternative explanation" for the defendant's actions. (*Ibid.*)

In *Herrera*, the jury received evidence that the defendant had been sexually molested as a child, sexually assaulted on two occasions later in life, and physically assaulted by a friend when he rebuffed the friend's sexual advances. (*Herrera*, *supra*, 247 Cal.App.4th at pp. 471-472.) At trial on charges for murder of a different friend, the defense presented evidence that the

22

defendant stabbed the victim after the victim made sexual advances that triggered a flashback of the prior abuse. (*Id.* at p. 473.) During trial, a psychiatrist and a psychologist testified that the defendant had been diagnosed with posttraumatic stress disorder (PTSD). (*Id.* at p. 474.) The psychologist testified generally regarding PTSD and peritraumatic dissociative state. (*Id.* at p. 475.) However, the psychologist was precluded from giving her opinion that on the date of the murder, the defendant was psychiatrically impaired or suffering from PTSD or peritraumatic dissociative state. (*Ibid.*)

On appeal, the majority opinion by our colleagues in Division Six reversed the judgment, concluding that the trial court prevented the defendant from "present[ing] the critical evidence in support of his only defense: expert testimony explaining how his past history of trauma was likely to affect his mental state at the time of the offense." (*Herrera, supra*, 247 Cal.App.4th at p. 480.) Because the defendant admitted killing the victim, the only issue was his mental state at the time of the killing. (*Id.* at p. 478.) The court concluded the error was prejudicial, since it undermined the only defense available to the defendant, and allowed the prosecutor to argue there was no explanation for the defendant's violent reaction to the victim's advances. (*Id.* at pp. 478-480.)

5. *The Trial Court Erred by Excluding Dr. Leifer's Testimony*

Defense counsel argued that Dr. Leifer would testify that Moine had been diagnosed with bipolar disorder, ADHD, anxiety, and depression. This testimony would tend to show that Moine's verbal outburst at the second clinic was "symptomatic of his [mental health] problems." The testimony could be construed by

23

the jury to indicate that Moine did not make the statements "with a criminal meaning," thus negating the specific intent required for making criminal threats. Defense counsel agreed that Dr. Leifer would not state an opinion on the ultimate issue: whether Moine did or did not actually have the mental state required for making criminal threats, conceding that this issue fell within the jury's purview.[10]

As illuminated by *Cortes* and *Herrera*, the trial court misapplied the law when it excluded all of Dr. Leifer's proffered testimony. Our Supreme Court has long held that the "introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense" is admissible under sections 28 and 29. (*People v. Coddington*, *supra*, 23 Cal.4th at p. 582.)

Moreover, in the penultimate hearing conducted after the prosecutor rested, the trial court indicated it was denying the defense request to call Dr. Leifer because it erroneously believed that Moine was only facing charges for general intent crimes. The court's wholesale exclusion of Dr. Leifer's testimony was

---

[10] We recognize that defense counsel's explanation for his proffer of Dr. Leifer's testimony was, at times, poorly stated. For instance, early in the proceedings, defense counsel explained Dr. Leifer would "testify to the ultimate fact of intent." Despite his occasional misstatements, we find that defense counsel adequately conveyed a proper basis for admission of the statements, and find it significant that he cited the *Cortes* opinion, which is dispositive of the issues raised here.

erroneous because the charge for making criminal threats is a specific intent crime.  (See § 422.)[11]

In denying the defense the opportunity to call Dr. Leifer as a witness, the trial court applied an overly restrictive interpretation of sections 28 and 29 that did not comport with the statutes themselves, and was not supported by the applicable case law.  We conclude the court abused its discretion by basing its decision on an incorrect legal standard.  (*People v. Knoller*, *supra*, 41 Cal.4th at p. 156; see *Conservatorship of Bower* (2016) 247 Cal.App.4th 495, 506 ["Case law is clear . . . that getting the legal standard wrong means that a subsequent decision becomes *itself* a per se abuse of discretion"].)

The respondent argues that Moine sought to admit Dr. Leifer's testimony for an improper purpose, i.e., to show that he did not have the *capacity* to form the intent required under section 422.  This contention lacks merit.

As explained by our Supreme Court, the diminished capacity defense was abolished by the Legislature in 1981.

---

[11] Under section 422, the crime of making criminal threats occurs when "[a]ny person . . . willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ."  (§ 422, subd. (a).)

(*People v. Elmore* (2014) 59 Cal.4th 121, 135.) "It allowed defendants to argue that because of mental infirmity" (*id.* at p. 135), they lacked "*capacity* to form a required mental state," which was essentially equivalent to a defense of insanity. (*Id.* at pp. 139-140.) *Elmore* teaches that "evidence challenging the defendant's actual formation of a mental state is admissible, but only so long as it does not go toward a claim of legal insanity." (*Id.* at p. 142.) "[S]ection 28[, subdivision] (a) has no effect on evidence of mental disorders that do not amount to legal insanity. . . . All relevant evidence of mental states short of insanity is admissible at the guilt phase under section 28[, subdivision] (a) . . . ." (*Id.* at pp. 145-146.) Here, defense counsel sought to introduce Dr. Leifer's testimony not for the improper purpose to show Moine *could not* form the requisite specific intent, but rather for the legally permissible purpose to show he *did not* act with specific intent. (See *Cortes*, *supra*, 192 Cal.App.4th at p. 908 [noting that a "defendant *can* call an expert to testify that he had a mental disorder or condition . . . , as long as that testimony tends to show that the defendant did or did not in actuality (as opposed to capacity) have the mental state . . . required for conviction of a specific intent crime"].)

Next, the respondent argues that Moine's mental illness was not relevant, stating that "simply because a defendant has a mental illness" does not mean that mental illness is "necessarily relevant on the issue of intent." While this may be true as a general proposition, the respondent does not effectively distinguish *Cortes* and *Herrera*, which both applied the well-established rule that where a defendant is charged with a specific intent crime, evidence of his or her mental illness is admissible for the purpose of negating that mental state.

26

The application of these well established rules leads us to the same conclusion that was reached by our colleagues in *Cortes* and *Herrera*.  " 'The gist of [the respondent's] complaint about Dr. [Leifer's] proposed testimony is that it would have given the jury a basis to *infer* that [Moine] actually did not harbor [the requisite intent for section 422], even if Dr. [Leifer] did not come out and say that [Moine] lacked such mental states.  That is exactly right.  However, such testimony is not "clearly prohibited by sections . . . [28] and 29."  On the contrary, it is exactly the type of testimony sections 28, 29, and the case law, permit.  In all of the cited cases, evidence was presented from which the jury could have properly inferred, from testimony that fell short of expressing an opinion that the defendant lacked the specific intentional state required for the charged crime, that the defendant actually lacked such intent.  The limits placed by the trial court on Dr. [Leifer's] testimony were unduly restrictive and an abuse of discretion.' " (*Herrera*, *supra*, 247 Cal.App.4th at p. 477, quoting *Cortes*, *supra*, 192 Cal.App.4th at p. 912.)

>    6.    *The Exclusion of Dr. Leifer's Testimony Was*
>          *Prejudicial*

Having concluded the rejection of Dr. Leifer's testimony was error, we must determine whether the error was prejudicial.  We apply the harmless error standard announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, to determine whether it is reasonably probable the defendant would have obtained a more favorable result in the absence of error.  (*Herrera*, *supra*, 247 Cal.App.4th at p. 478.)

Here, as in *Cortes* and *Herrera*, the prosecutor took full advantage of the absence of Dr. Leifer's testimony.  The prosecutor's theme in closing argument was that the evidence

27

revealed a pattern where Moine would react violently when confronted with what he perceived as "rudeness." She repeatedly emphasized the significance of Moine's physical behavior during the second incident, linking it to specific intent with statements such as the following: "[T]he circumstances convey the serious intention to carry out the threat," based on "[t]he circumstances of him yelling, screaming, citing the [Parkland] shootings. All of that shows that that is his intention." The prosecutor ended her final argument by stating: "Ladies and gentleman, [Moine], when confronted with people who disrespect him, who are rude to him, he reacts violently and [volatilely]."

By excluding the testimony by Dr. Leifer, the jury was left with no explanation as to why Moine was seeking medical treatment at the second office, and it received no evidence in support of his defense that he lacked the specific intent to make a criminal threat because he was suffering from the effects of a diagnosed mental illness at the time of the second incident. The "excluded testimony could well have offered the jury a basis to infer an alternative explanation for" Moine's actions, sufficient to overcome the prosecution's argument that he acted deliberately in response to the rude behavior of the office staff. (*Cortes, supra,* 192 Cal.App.4th at p. 913; accord, *Herrera, supra,* 247 Cal.App.4th at pp. 478-479.)

Moreover, the evidence before the jury turned on the accuracy of the recollection by four witnesses of the statements made by Moine at the clinic. The officer manager, the nurse, Moine, and his mother, each recalled a different version of the statements. Moine and his mother disputed the content of the statements as reported by the nurse and the office manager.

28

Their testimony indicated the statements could have been construed as hypothetical or conditional hyperbole.

Finally, the record reveals the jury closely evaluated the prosecution's evidence in the criminal threats case. The jury asked the court whether they had to agree on each element of the charge of making criminal threats, and then asked for a complete readback of the testimony by the office manager, the nurse, and Moine's mother. The jury's question, coupled with its request for readback, indicate that it had some difficulty arriving at a verdict, two signposts indicating the error in excluding Dr. Leifer's testimony was not harmless. (See *People v. Filson* (1994) 22 Cal.App.4th 1841, 1852 [a request for additional instructions showed the jury was "troubled" by the case], disapproved on another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["Juror questions and requests to have testimony reread are indications the deliberations were close"].)

The record as a whole shows it is reasonably probable Moine would have obtained a more favorable result if Dr. Leifer's testimony had not been excluded. Therefore, we conclude the error was prejudicial and warrants reversal.

## C.   Remaining Issues

Having concluded reversal is necessary due to the exclusion of Dr. Leifer's testimony, we do not reach Moine's remaining arguments. We note that the jury's acquittal on the 2017 assault charges, which bars retrial on those charges, renders moot the question of joinder of the two sets of charges. (See Cal. Const. art. I, § 15; §§ 654 & 1151.)

29

## DISPOSITION

The trial court's judgment and the order denying mental health diversion are reversed and the matter is remanded with directions. On remand, the trial court shall conduct a new hearing to consider Moine's eligibility for mental health diversion pursuant to section 1001.36. In the event the court determines Moine meets the criteria for mental health diversion and grants diversion, the court shall dismiss the charges when and if Moine successfully completes diversion. In the event the court determines that Moine is not eligible for diversion, or if Moine does not successfully complete diversion, the trial court may conduct a new trial on the charges for making criminal threats in violation of section 422 in accordance with this opinion.

CERTIFIED FOR PARTIAL PUBLICATION

FEDERMAN, J.*

We concur:

CHANEY, J.

BENDIX, Acting P. J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.