Filed 7/29/24  P. v. Vargas CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOSE LUIS VARGAS,<br><br>        Defendant and Appellant. | B333715<br><br>(Los Angeles County<br>Super. Ct. No. BA357550) |

APPEAL from an order of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Reversed.

Jeffrey Manning-Cartwright, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In 2007, defendant and appellant Jose Luis Vargas, who was driving with a blood-alcohol content of at least 0.25 percent, smashed his car into another vehicle, killing the two people in that vehicle. Because Vargas had two prior convictions for driving under the influence of alcohol (Veh. Code, § 23152) and had been warned of the dangers of drunk driving, he was charged with two counts of second degree murder (Pen. Code, § 187).[1] A jury found him guilty as charged, and the trial court sentenced him to two consecutive sentences of 15 years to life.

Vargas's record in prison has been by all accounts exemplary. He has completed numerous rehabilitation programs, including several related to alcohol and drug abuse, and has a pristine disciplinary record. In 2020, the Department of Corrections and Rehabilitation (CDCR) recommended, pursuant to then-section 1170, subdivision (d),[2] that the trial court recall Vargas's sentence and resentence him. After a hearing at which Vargas presented additional evidence of his rehabilitation, the trial court issued an order recalling his sentence but reimposing the original sentence of 30 years to life. The court relied on two primary grounds for declining to reduce Vargas's sentence. First, Vargas's alcohol addiction and multiple instances of drunk driving leading up to 2007 showed to the court he would still pose a serious risk to public safety, despite his record of sobriety in

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

[2] As we explain below (see Discussion, part A, *post*), in 2021, the Legislature substantially amended this provision, which is now codified at section 1172.1. The trial court decided the matter based on the new version of the law.

2

prison.  Second, in the court's view, a 30-year minimum sentence remained appropriate based on the seriousness of Vargas's offenses.

Vargas appeals, contending that the trial court failed to give him the benefit of the "presumption favoring recall and resentencing of the defendant" (§ 1172.1, subd. (b)(2)) triggered by a CDCR recommendation when the court combined recall with resentencing in deciding the matter.  He argues further that the trial court abused its discretion by making inconsistent findings when reinstating his original sentence.  The presumption favoring recall and resentencing may be overcome only if the defendant currently poses an unreasonable risk of committing a new so-called "super strike" offense.  (*People v. Braggs* (2022) 85 Cal.App.5th 809, 818.)  Here, after the court necessarily found Vargas did not pose an unreasonable risk of committing a new super strike offense by recalling the original sentence, the court then paradoxically found that Vargas *did* pose an unreasonable risk of committing such an offense to reimpose the original sentence.

We agree with Vargas as to this latter point.  Vargas certainly posed a serious risk to public safety at the time of his conviction, but there is no substantial evidence that he currently poses an unreasonable risk of committing a super strike offense.  Because we cannot be certain that the court would have reached the same decision when resentencing Vargas in the absence of that finding, we remand the case for a new resentencing hearing.

## FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

### A.    Trial and Sentencing

The following account of the facts is drawn from our prior nonpublished opinion in which we affirmed Vargas's convictions, *People v. Vargas* (June 24, 2011, B221569) (nonpub. opn.).

At around 1:00 a.m. on December 8, 2007, Vargas was driving eastbound on Sunset Boulevard in Hollywood on his way home from a company holiday party. He crossed the intersection with Gower Street against a red light and collided with a car traveling north on Gower. The driver of the other car, Sam Cassel, and the passenger, Rhiannon Meier, both died at the scene. A blood sample drawn one hour after the crash showed that Vargas's blood-alcohol content was 0.24 percent, which suggested that his blood-alcohol content would have been 0.25 to 0.27 percent at the time of the crash. An officer who investigated the incident testified that Vargas's car was most likely moving at around 46 to 49 miles per hour at the time of the crash, and there was no indication that it slowed down prior to impact.

Vargas had suffered two prior convictions for driving under the influence, one in 1998 and the other in 2004. According to a witness, after the 1998 conviction, Vargas participated in a victim impact panel during which participants were warned that if they drove drunk and killed someone, they could be charged with second degree murder. Another witness testified that, during a program following the 2004 conviction, Vargas stated that a letter from a prison inmate who had killed someone while driving under the influence resonated with him because he had nearly killed someone in his first DUI offense.

At the sentencing hearing, Vargas demonstrably failed to appreciate the enormity of his actions. He said the trial taught

4

him "how to love the people that persecute me wrongfully," and asked the court "to forgive me because this was an accident. It could happen to anybody at any time." In addition, he asked the victims' family and friends "to forgive me as I forgive them for trying to persecute me."

The trial court, in imposing sentence, told Vargas, "even still you don't get it," and said "[t]here is no way we can even punish you for what you did because what you did is so great, so horrendous, so immense that no punishment would be adequate."

## B.     Resentencing Proceedings

On December 7, 2020, the CDCR sent a letter to the trial court recommending that Vargas be resentenced under then-section 1170, subdivision (d)(1) based on Vargas's "exceptional conduct" in prison, explaining that he had remained free of rules violations and had "demonstrated a commitment to [his] rehabilitation through voluntary participation in self-help programs." The District Attorney submitted the matter to the court's discretion without taking a position on whether resentencing was appropriate.

Vargas's attorneys submitted nearly 1,500 pages of materials in support of resentencing, including letters of support from prison staff, family, and friends, and records of Vargas's participation in rehabilitative, religious, and charitable programs while in prison. Vargas also offered plans for his life outside prison, including several offers of assistance in finding employment and a plan for preventing relapse with alcohol addiction. Finally, Vargas wrote apology letters to the families of his victims in which he took full responsibility for causing their deaths, as well as a short autobiography in which he described an addiction to alcohol that began at the age of 10. Vargas

5

requested that he be resentenced either to probation, or alternatively, for the court to order the sentences for his murder convictions to run concurrently, with the result that he would be eligible for parole after serving 15 years, rather than 30 years.

The court conducted a hearing on the matter on July 22, 2022. During the hearing, Vargas's attorney read into the record a letter his client had written. With respect to the fatal crash, Vargas wrote, "I am alone responsible for that act and for those decisions. My disregard for life and the law at the time is the reason we are all here today. I live with these facts every single day. I take full responsibility and have been made accountable for those actions. I am sorry to the very core of myself. I'm deeply remorseful for the psychological pain, harm, and hurt, the emotional and physical trauma that I alone have caused to Mr. and Mrs. Meier . . . and Mr. and Mrs. Cassel's family. I broke their hearts, and there's no answer or justification for what I did that night. And for those reasons, I am very, very, very sorry." Vargas requested that his sentence be reduced by only eight years, to a minimum term of 22 years.

After the hearing, all parties agreed that a psychologist should examine Vargas. In a report filed with the trial court in March 2023, the psychiatrist who conducted the examination wrote that Vargas "has made some substantial changes in his life" and "is now extremely remorseful" about what he did, noting that Vargas "cried uncontrollably for nearly five minutes toward the end [of the examination] when talking about what he had done to the two people he killed as well as to their extended families and the amount of suffering that he generated." The psychiatrist concluded that, "[t]o the extent that someone can be rehabilitated after this type of an offense, . . . Vargas has," and

that "he has made very substantial changes in his personality, value system and his view of life in general. He has done his best while incarcerated to do something productive with his life. He has wanted to help others, but I believe in the process he has greatly helped himself as well[,] as he is a changed person and certainly less troubled than he was when he was drinking heavily."

On August 22, 2023, the trial court issued an order reimposing the original sentence of 30 years to life. The court found that Vargas's "level of maturity has improved significantly during his period of incarceration," that his accomplishments while in prison were "quite impressive," and stated that it was "greatly moved by the very positive assessments of him" by those who knew him. Nevertheless, the court concluded that a modification of Vargas's sentence would be inappropriate because Vargas's "alarmingly inveterate inability to consume alcohol responsibly—and to appreciate the grave dangers associated with his past failures to do so—reveal him to be an enduring and therefore unacceptable risk to public safety." (Fn. omitted.) Vargas chose to drive drunk "despite his realization he had just narrowly avoided killing someone else while driving under the influence a few years earlier. Given what is generally understood as the very intractable nature of alcohol addiction, the court has little confidence [Vargas] would not likely engage in similar conduct if afforded the opportunity free from confinement to do so. As such, the court finds that he presents an unreasonable risk to public safety within the meaning of . . . [section] 1170.18, subd[ivision] (c)." The court explained that its skepticism regarding Vargas's "prospects for living a law-abiding life is shaped partly from his rather contemptible behavior during the

original sentencing proceedings. [Vargas] sat slumped forward in his chair, his expression alternating between anger and nonchalance. He also looked around the room indignantly while listening to several victim-impact statements and appeared exasperated by some of the emotional commentary. Later, when the court inquired whether he had anything to say before receiving sentence, he self-righteously objected to being 'persecuted,' claiming that it all was, after all, 'just an accident.' His insensitive lack of remorse and accountability were on full display."

In addition to finding that Vargas presented an unreasonable risk to public safety, the court also concluded that Vargas's original "sentence is simply the most appropriate punishment for his crimes." "While the court understands rehabilitation is an important objective of criminal sentencing, it also appreciates the importance also [*sic*] of punishment and deterrence. [Citation.] . . . In the final analysis, . . . the court cannot justify any downward departure from [Vargas's] original sentence given his horrific behavior and its consequences. As mentioned before, this behavior included, among other things, his relentless commission of yet another DUI, fully realizing the dangers and liabilities this posed; the many frustrated attempts by the criminal justice system to reform him; the fact he intentionally and with gross recklessness sped down a roadway in the heart of Hollywood within the early hours following a late Friday night; the fact he did this with a blood alcohol level of 0.25 percent; and the fact his behavior predictably caused multiple fatalities. The court carefully weighed and considered all of the evidence at the original sentencing proceedings and then concluded beyond question nothing short of two consecutive life

terms would be the appropriate sanction for this egregious conduct.  This conclusion remains unchanged despite [Vargas's] impressive rehabilitative achievements."

## DISCUSSION

### A.    Background on Resentencing Under Section 1172.1

Trial courts have long had the authority to recall and resentence a convicted defendant upon the recommendation of the secretary of the CDCR or certain other officials.  (See *Dix v. Superior Court* (1991) 53 Cal.3d 442, 457.)  The court, upon receiving such a recommendation, has discretion to "recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if [he or she] had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence."  (Former § 1170, subd. (d)(1).)  If the court accepts the recommendation, it "has jurisdiction to modify *every* aspect of the sentence" (*People v. Buycks* (2018) 5 Cal.5th 857, 893), and can "impose any otherwise lawful resentence suggested by the facts available at the time of resentencing." (*Dix v. Superior Court*, *supra*, at p. 456.)  The former version of the statute did not, however, establish any procedural requirements the court must follow in addressing a recommendation from the CDCR; indeed, it "apparently [did] *not* require the court to respond to the recommendation."  (*Id.* at p. 459, fn. omitted.)

In 2021, the Legislature enacted Assembly Bill No. 1540 (2021-2022 Reg. Sess.), which, in recognition of "the scrutiny that has already been brought to these referrals by the referring entity" (Stats. 2021, ch. 719, § 1(h)), forbade courts from ignoring recommendations for recall and resentencing.  Under the new version of the law, codified initially at section 1170.03 and

9

subsequently renumbered as section 1172.1, when a court receives a resentencing request "from the Secretary of the Department of Corrections and Rehabilitation, the Board of Parole Hearings, a county correctional administrator, a district attorney, or the Attorney General" (§ 1172.1, subd. (b)), it must notify and appoint counsel to represent the defendant, and must set a status conference within 30 days.  (*Id.*, subd. (b)(1).)  In addition, in cases where the court receives a recommendation, "[t]here shall be a presumption favoring recall and resentencing of the defendant, which may only be overcome if a court finds the defendant currently poses an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18." (§ 1172.1, subd. (b)(2).)  "Subdivision (c) of section 1170.18 in turn defines an unreasonable risk of danger to public safety as 'an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of [section 667, subdivision (e)(2)(C)(iv)].'  This 'subdivision of section 667 identifies eight types of particularly serious or violent felonies, known colloquially as "super strikes." '  [Citation.]" (*People v. Braggs*, *supra*, 85 Cal.App.5th at p. 818, fn. omitted.)

Under the new version of the law, "The court shall state on the record the reasons for its decision to grant or deny recall and resentencing."  (§ 1172.1, subd. (a)(7).)  If the court elects to deny resentencing, it must first hold "a hearing where the parties have an opportunity to address the basis for the intended denial or rejection." (*Id.*, subd. (a)(9).)

In Assembly Bill No. 1540 and in subsequent bills, the Legislature has amended the law in other ways for the benefit of defendants.  When resentencing a defendant, the court "shall apply the sentencing rules of the Judicial Council and apply any

10

changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing." (§ 1172.1, subd. (a)(2).) In addition, when resentencing a defendant, the court is not limited to imposing sentence on the basis of the original judgment, but may instead "[v]acate the defendant's conviction and impose judgment on any necessarily included lesser offense or lesser related offense, whether or not that offense was charged in the original pleading, with the concurrence of the defendant, and then resentence the defendant to a reduced term of imprisonment." (*Id.*, subd. (a)(3)(B).) The new version of the law also directs trial courts to "consider postconviction factors" such as the defendant's record of rehabilitation while incarcerated, "and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice." (*Id.*, subd. (a)(5).)

The law does not, however, otherwise restrict the sentence the court may impose if it accepts the recommendation and recalls the sentence. As before, the court may "resentence the defendant in the same manner as if they had not previously been sentenced, . . . provided the new sentence, if any, is no greater than the initial sentence." (§ 1172.1, subd. (a)(1).)

## B. The Procedure the Trial Court Followed Was Not Error

Vargas objects to both the form and the substance of the trial court's decision; we begin by discussing the form. In its August 2023 order reimposing Vargas's original sentence, the trial court stated that it had recalled the sentence more than one year earlier, prior to the resentencing hearing on July 22, 2022. In Vargas's view, "that did not really happen. Instead, the court

11

heard arguments on all aspects of the matter on July 22, 2022, took the matter under submission, and announced all at once [in its order dated] August 22, 2023, that it had granted the CDCR's request, recalled the sentence, considered resentencing options, and decided to reimpose the original sentence because appellant was currently dangerous and the original sentence fit the crime." Vargas argues this was improper because it allowed the trial court to "remov[e] the presumption" under section 1172.1, subdivision (b)(2) in favor of resentencing, and, in effect, deny the recommendation to recall his sentence while purporting to grant it.

We disagree. First, although the decision to recall a defendant's sentence is analytically distinct from the decision on what sentence to impose upon resentencing, nothing in section 1172.1 forbids courts from dealing with both issues in a single order, as Vargas alleges the court did here. Furthermore, even after the recent amendments, the law does not require the trial court to reduce a defendant's sentence if it grants recall and resentencing. To the contrary, the statute instructs the trial court to "resentence the defendant in the same manner as if they had not previously been sentenced," subject only to the restriction that the new sentence must be "no greater than the initial sentence." (*Id.*, subd. (a)(1).) The court in *Braggs* analyzed the legislative history of the recent amendments to the law and concluded that "[t]he Legislature's intent was . . . to 'ensure' that the Secretary's referral was given 'court[] consideration,' . . . by '*providing the opportunity* for resentencing,' [citation]," but not a guarantee of a reduced sentence. (*People v. Braggs, supra,* 85 Cal.App.5th at p. 819.)

12

Vargas argues the procedure the trial court followed cannot be proper "because it would convert [the presumption favoring the defendant under section 1172.1,] subdivision (b)(2) into meaningless surplusage, defeating its purpose and leading to absurd consequences.  In *every* case the trial court could deny meaningful relief at will despite the presumption and despite the failure to overcome it, simply by describing its action as granting recall, resentencing the defendant, and reimposing the same sentence, rather than denying recall and resentencing."

We are not persuaded.  A trial court's decision to recall a defendant's sentence provides real and concrete benefits, and does not allow trial courts to mechanically reimpose a defendant's original sentence in the manner Vargas suggests.  Under the law as amended, in all resentencing proceedings, the court must "apply the sentencing rules of the Judicial Council and apply any changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing."  (§ 1172.1, subd. (a)(2).)  In some cases, changes in the law may require the trial court to strike enhancements from a defendant's sentence.  For example, in *Braggs*, two enhancements under section 667.5, subdivision (b) could no longer be imposed under current law, and the trial court accordingly reduced the defendant's sentence by two years. (*People v. Braggs*, *supra*, 85 Cal.App.5th at pp. 815-816.)

In addition to changes like those in *Braggs*, other recent enactments have benefitted defendants by restricting the trial court's discretion to impose a more severe sentence.  For example, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721) strongly discouraged trial courts from imposing multiple enhancements in a single case, as well as enhancements that

13

could result in a sentence of more than 20 years.  (See *People v. Anderson* (2023) 88 Cal.App.5th 233, 239-240, review granted Apr. 19, 2023, S278786.)  Similarly, Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) created a presumption against imposing high-term sentences and, for young offenders, a presumption in favor of low-term sentences.  (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039.)  Section 1172.1 itself also gives courts discretion to impose lower sentences.  Under section 1172.1, subdivision (a)(3)(B), a court may "impose judgment on any necessarily included lesser offense or lesser related offense, whether or not that offense was charged in the original pleading."

Trial courts are required to give the benefit of all these amendments to defendants resentenced under section 1172.1.  As our Supreme Court has explained, resentencing proceedings are governed by "the 'full resentencing rule' " (*People v. Buycks*, *supra*, 5 Cal.5th at p. 893), under which the court must reconsider all of its previous decisions and "consider[ ] . . . any pertinent circumstances which have arisen since the prior sentence was imposed."  (*Dix v. Superior Court*, *supra*, 53 Cal.3d at p. 460; accord, § 1172.1, subd. (a)(5) ["In recalling and resentencing pursuant to this provision, the court shall consider postconviction factors"].)  This means weighing all relevant factors and determining a new sentence, not going through the motions before rubber stamping the original sentence.

## C. The Trial Court Abused its Discretion by Relying on an Unsupported Finding that Vargas Was Unreasonably Likely to Commit a Future Super Strike

Although we find no fault with the trial court's procedure in addressing the resentencing recommendation, we cannot say the same as to the substance of the court's decision. As noted above, section 1172.1 establishes a presumption in favor of resentencing "which may only be overcome if . . . the defendant currently poses an unreasonable risk . . . to public safety," meaning an unreasonable risk of committing a super strike. (*Id.*, subd. (b)(2).) In granting recall of Vargas's sentence for purposes of resentencing, the court necessarily found this presumption was not overcome and that Vargas did not currently pose an unreasonable risk of committing a super strike. When resentencing Vargas, however, the court then proceeded to find the exact opposite—that Vargas *did* pose an unreasonable risk of committing a super strike as one of its grounds for reimposing the prior sentence. We agree with Vargas that the trial court abused its discretion[3] in making such a contradictory finding in

---

[3] In the context of petitions for resentencing under section 1170.18, findings of current dangerousness are reviewed for abuse of discretion. (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242; *People v. Hall* (2016) 247 Cal.App.4th 1255, 1264.) In *People v. Moine* (2021) 62 Cal.App.5th 440, we held that the same standard applied in the context of petitions for pretrial diversion under section 1001.36, where the statute explicitly referred to section 1170.18 for its definition of current dangerousness. (*Moine*, *supra*, at pp. 448-449.) By the same logic, we conclude that the abuse of discretion standard applies to section 1172.1, which also defines dangerousness by reference to section 1170.18.

resentencing him, and that substantial evidence does not support the court's finding that Vargas currently poses an unreasonable risk of committing a super strike as a basis for reinstituting the original sentence.

The sole evidence the trial court cited in support of its finding of current dangerousness (which is also the only evidence to which the People direct us) was Vargas's history of driving under the influence. That evidence was extensive and indicated that Vargas was unwilling or unable to refrain from drunk driving despite knowing it might harm or even kill others. Furthermore, Vargas's conduct at his original sentencing hearing, after his latest in a series of drunk driving incidents had caused the deaths of two people, suggested that he was incapable not only of stopping his chronic drunk driving, but even of recognizing "his horrific behavior and its consequences." There was every reason to believe Vargas was incorrigible, and there is no dispute Vargas posed an unreasonable risk of danger to public safety at the time of his original sentencing.

But that original sentencing took place 15 years ago, and by all appearances Vargas has turned his life around during his time in prison. He has completed alcoholics anonymous and narcotics anonymous programs and has not relapsed over that extended period, even though, as his attorney noted during the resentencing hearing, "[a]lcohol and drugs are readily available in the prisons." To find on the record before us that Vargas continues to pose an unreasonable risk to public safety because he is likely to commit another homicide[4] upon release suggests

_____

[4] As noted above, the question whether a defendant remains currently dangerous is whether the defendant is likely to

16

that rehabilitation is essentially impossible for addicts, as there is no evidence on this point other than Vargas's rehabilitation.

The record indicates the trial court placed undue emphasis on Vargas's behavior during the original sentencing hearing without consideration of events in the intervening 15 years. At the July 22, 2022 hearing, the court stated, "I remember the trial as though it were yesterday," and noted Vargas's callousness toward the families of his victims and his refusal to accept responsibility for his actions at the time. The court stated that sometimes criminal defendants "actually are appreciative of the fact that finally they were brought to a position where they had to engage in some introspection and recognize their need for change," but "I haven't heard that from" Vargas. Yet earlier in the same hearing, Vargas's attorney read a letter from Vargas that included the following passage: "I'm not the same dysfunctional person that sat in front of you 15 years ago. [Fifteen] years can bring a lot of change and growth to a person. And being incarcerated can accelerate the process if you're looking for help to change and grow. The young man I was when first incarcerated is unrecognizable to me today. I was selfish. I was reckless. I was careless. I relied heavily on alcohol and drugs to self-medicate the fear and childhood trauma. I didn't

---

commit another so-called "super strike" offense as defined in section 1170.18, subdivision (c) upon release. The list of super strike offenses (see § 667, subd. (e)(2)(C)(iv)) includes other offenses apart from homicide, such as sexually violent offenses, certain sexual offenses committed against children, possession of a weapon of mass destruction, and any crime punishable by life imprisonment or death, but in Vargas's case, the only relevant offense is homicide.

17

have the power to acknowledge or the skills to articulate the process." In short, the court seemed determined to see Vargas as he was in 2009, not in 2022.

This is the wrong lens with which to determine current dangerousness. As the court noted in addressing the same issue in the context of Proposition 36 in *People v. Buford* (2016) 4 Cal.App.5th 886, "the proper focus is on whether the [defendant] *currently* poses an unreasonable risk of danger to public safety." (*Id.* at p. 913.) The circumstances of the original offense are of course relevant to that question, but they do not justify disregarding what has happened since.

The People, relying primarily on *Braggs*, argue that we should nevertheless affirm the trial court's sentencing decision because any error regarding the finding of current dangerousness was harmless. We do not agree that the reasoning in *Braggs* applies here to show harmlessness. In *Braggs*, the trial court initially denied recall and resentencing at a 2021 hearing, but the defendant filed a motion for reconsideration pointing out that the Legislature had recently enacted Assembly Bill No. 1540, which amended the resentencing statute effective January 1, 2022. (*People v. Braggs*, *supra*, 85 Cal.App.5th at pp. 814-815.) The court granted the motion and conducted a new hearing once the new law became effective. The court recalled the sentence and imposed a new sentence that eliminated two sentence enhancements, thereby reducing the defendant's sentence by two years. (*Id.* at pp. 815-816.) The defendant appealed, arguing that the trial court erred by failing to apply the presumption favoring recall and resentencing. The court disagreed because the trial court "in fact *recalled* [the] defendant's sentence and *resentenced* him. [The d]efendant was therefore not prejudiced by

18

any purported failure of the court to apply the presumption or the purported lack of evidence to support a finding overcoming the presumption." (*Id.* at p. 819.)  There is no indication that the trial court in *Braggs* made a finding regarding the defendant's dangerousness, nor that it played any role in the choice of a new sentence.

The error here was not harmless.  True, it did not deprive Vargas of a resentencing hearing, as the court did recall Vargas's sentence and resentenced him.  But the court's unsupported finding that Vargas was unreasonably likely to commit a new super strike offense made the resentencing proceeding an empty exercise as persons that pose such risk are not entitled to resentencing at all.

We agree with the People that although section 1172.1, subdivision (b)(2) makes the question of the defendant's current risk of committing a super strike offense central to the court's decision whether to recall and resentence, the more general question of the danger a defendant poses to society distinct from a super strike offense is a proper consideration in deciding the length of the new sentence.  Section 1172.1 instructs courts to "resentence the defendant in the same manner as if they had not previously been sentenced" (*id.*, subd. (a)(1)), and the defendant's potential dangerousness is a factor in any sentencing proceeding. (See Cal. Rules of Court, rule 4.410(a)(1), (a)(5) ["General objectives of sentencing include . . . [¶] . . . [p]rotecting society" and "[p]reventing the defendant from committing new crimes by isolating him or her for the period of incarceration"].)  The prejudicial error in this case was not that the trial court took dangerousness into account, but that it relied on a self-contradictory and unsupported finding that Vargas "currently

poses an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18" (§ 1172.1, subd. (b)(2)) as a basis for reimposing the original sentence.

The People correctly note dangerousness was not the trial court's sole basis for reimposing the original sentence. The court also cited the importance of punishment and deterrence as factors in sentencing (see Cal. Rules of Court, rule 4.410(a)(2), (a)(4)), and found that it could not "justify any downward departure from [Vargas]'s original sentence given his horrific behavior and its consequences." But the trial court did not present the issues of punishment and deterrence as independent of dangerousness. Instead, it is clear from the court's sentencing order that all these factors together led the court to conclude that any reduction in sentence would be inappropriate. Without a finding of dangerousness, we cannot be certain the trial court would have made the same decision. Because Vargas has "demonstrate[d] there is a reasonable probability that in the absence of the error he . . . would have obtained a more favorable result" (*People v. Lightsey* (2012) 54 Cal.4th 668, 699; accord, *People v. Watson* (1956) 46 Cal.2d 818, 836), the error was not harmless.

We reiterate that a lack of unreasonable risk that Vargas will commit another homicide provides Vargas only " '*the opportunity for resentencing*' " (*People v. Braggs*, *supra*, 85 Cal.App.5th at p. 819), and does not guarantee a reduction in sentence. Nor do we express any opinion as to the proper sentence for the court to impose upon remand. Vargas remains guilty of two murders, and we do not mean to minimize the effect of his actions in ending the lives of his two victims and devastating their families. Nevertheless, under section 1172.1,

Vargas is entitled to be judged and sentenced based on who he has become in the years after the murders, not solely on who he was at the time.

## DISPOSITION

The judgment of the trial court is reversed, and the matter is remanded to the trial court for a new sentencing hearing.

NOT TO BE PUBLISHED

                                        WEINGART, J.

We concur:

BENDIX, Acting P. J.

KELLEY, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.